Filed 4/14/16  In re J.R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER R.,<br><br>Defendant and Appellant. | F072225<br><br>(Super. Ct. No. 15CEJ300118-1)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Jane Cardoza, Judge.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Brent C. Woodward, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Christopher R. appeals from the juvenile court's dispositional order.  He challenges the sufficiency of the evidence upon which the juvenile court ordered his son,

J.R., removed from his physical custody.  (Welf. & Inst. Code, § 361.)[1]  Christopher contends the dispositional order must be reversed because there was no evidence J. was at risk in his care and there were less restrictive alternatives to removal.  He also contends the juvenile court failed to recognize him as J.'s presumed father.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2015,[2] Christopher was living in an apartment with his wife of about three years, Tiffany R., their three-year-old son, J., and Tiffany's girlfriend, Corina.  Just eight months earlier, in August 2014, the family's voluntary family maintenance (VFM) case was closed.  That case began in October 2013, when Tiffany agreed to receive VFM services after she tested positive for methamphetamines and the Department substantiated allegations of general neglect and physical abuse.  Christopher was aware of Tiffany's drug use.  Both parents denied excessive corporal punishment and there were no signs of physical abuse on J.

In the early morning hours of April 19, the Fresno County Department of Social Services (Department) received a referral that J.'s parents had engaged in a domestic violence incident in which Christopher burned J. with a cigarette when he tried to grab J. from Tiffany.  The police responded and placed a section 300 hold on J.  Tiffany, who was on probation following a conviction for identity theft, was arrested for being under the influence, while Christopher had reportedly fled the scene.  A social worker who responded to the home of J.'s maternal grandmother, Lucy G., where J. was located, noticed a "very small red, blistery-like mark" on J. that was consistent with some type of burn.

On April 20, social workers interviewed Tiffany at the jail.  According to Tiffany, the day before she and Christopher had gotten into an argument at their apartment

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] References to dates are to the year 2015, unless otherwise stated.

because he did not want her to go out. While Christopher was trying to get J., his cigarette touched J. on the head. After that, Tiffany asked Corina to take J. away; Corina took J. to Lucy, although "[s]he wasn't supposed to." Tiffany denied that Christopher hit her or was physically aggressive toward her, and said there were no other incidents of arguments or fighting. Tiffany claimed that Corina was trying to break them up. Tiffany did not have any concerns about Christopher and was fine with Christopher having J. in his care.

Tiffany admitted to the social workers that she "snorted two lines" of "Meth" after Corina took J., but she denied using drugs around J. Tiffany acknowledged that she had completed a treatment program and classes during her VFM case. When asked when she started using drugs again after the VFM case closed in August 2014, Tiffany responded that she only used when she was "going through something," but claimed that the night of the incident was the first time she had used again.

The social workers also interviewed Christopher and J.'s paternal grandmother, Katherine R., at Katherine's home. When Christopher was told that J. was in foster care, Christopher stated he was glad that J. was not with Tiffany. Christopher told the social workers he filed that morning for a divorce and custody of J., and for restraining orders against Tiffany and Corina. Christopher did not have a criminal history in Fresno County or a record of convictions in the state.

Christopher told his version of what happened the night of the incident. At midnight, Tiffany was drunk and high on marijuana. When she and Corina came into the living room to go out for the seventh night in a row, Christopher told Tiffany he was tired of being home alone at night and she was not "contributing to being a parent." Tiffany and Corina then tried to take "my son." While holding a cigarette in his hand, he got into a dispute with Tiffany. As he tried to grab J., "they pushed his [] head and it touched my cigarette." Tiffany and Corina took J. and left in Christopher's car. When Christopher

3.

ran out after them, "there was a guy there to kick my ass[,]" who was Corina's friend. Instead of doing that, the man gave him a ride to Katherine's home.

Christopher stated he was advised in the VFM case that he should seek custody or a divorce if he began to notice Tiffany behaving like she did when the prior case began. After the incident, Christopher went to work for 11 hours. When he got "home," he planned with Katherine what to do next, and they decided he would file for custody. Christopher had not spoken with Tiffany since the incident, but he had been receiving text messages from Corina, who he believed instigated the situation. According to Christopher, since the VFM case closed, things had been fine until Corina "moved in with her stuff." Christopher did not know how long Tiffany had been using drugs. When asked if he knew what she looked like when she was using, Christopher responded that he didn't "even know anymore." He had not caught Tiffany using drugs, but two weeks before he found paraphernalia in Tiffany's purse, which he threw away, as he did not want "that stuff around my son." Tiffany had recently been behaving like "when she was a heavy user."

Christopher denied that he and Tiffany engaged in a physical fight. When asked about prior incidents of domestic violence, Christopher stated there was one incident during the VFM case where Tiffany was the aggressor and she had to participate in "anger management." When asked if he participated in any services, Christopher responded, "I'm perfect, I was doing nothing wrong[,]" and the military gave him extensive training. Christopher confirmed that he and Tiffany had been living together, but he said that Tiffany was out when he was home. Christopher was in the army reserves, worked full time in construction, and went to school on the GI bill studying for a bachelor's degree in psychology. When asked about discipline, Christopher stated "[i]t depends" and that he would threaten J. with a belt, but knew he could not hit him. Instead, he would put J. in the room or a corner for five minutes. Christopher had been staying at Katherine's home since he did not have a key to his car or apartment.

4.

Lucy called the social worker and explained that on the night of the incident, she received a call from Corina, who was helping care for J.; Corina said "they got into a really ugly fight," and Corina was bringing J. to Lucy. Corina told Lucy that Christopher was throwing things in the apartment and "went crazy." Christopher and Tiffany were arguing about Tiffany going with Corina to a casino; he did not want Tiffany to leave. Christopher went crazy, got a cigarette, and burned J. on the back of the neck. After Corina brought J. over, she left to look for Tiffany. The paramedics came after Lucy called 911, but they could not take J. without a parent's consent.

On April 21, a team decision meeting was held at the Department on J.'s behalf, which Christopher, Katherine, Lucy, Tiffany, and a maternal aunt attended, along with the social workers. Christopher admitted there was a history of domestic violence, which originally was against him, but ultimately he was not charged; instead, Tiffany was arrested. Tiffany claimed Christopher hit her on the head with a jewelry box, but she was too afraid to tell police because she was afraid of Christopher. Christopher denied hitting Tiffany, stating "No injury no evidence." Both Lucy and Katherine pointed out Tiffany's drug use and Christopher's enabling.

Lucy reported that J.'s parents would bring J. to her home and she would watch him for hours to days out of the week. Tiffany shared she had been concerned about J. for the last six months and that she did not trust Christopher around him. Tiffany reported that she and Christopher were not together anymore. Christopher was concerned because Tiffany was a drug addict and did not want to be a family. Christopher said he told Tiffany he would divorce her and take their son, and "then the squabble happened and they took J[]." Christopher stated they did not have problems until Tiffany brought Corina around. Christopher admitted there was a domestic violence incident during the VFM case, but "we repaired after that." Christopher wanted to be a family.

The social workers were concerned that the family did not take any action to protect J. prior to the Department's involvement, despite having been provided services

in the VFM case and being fully aware of the Department's expectations. A social worker recommended filing a petition on J.'s behalf and offering court-ordered services to the parents as neither parent was able to make a safe plan of care for J., and they were making accusations and allegations against each other. It was determined that VFM services were inappropriate at that time due to the family's prior participation in such services. During the VFM case, services were extended for Tiffany because she struggled with them. While Christopher did not receive services directly, he was part of the household and safety net for the family during the course of that case.

The Department filed a dependency petition alleging that J. came within the provisions of section 300, subdivision (b), based on: (1) Tiffany's substance abuse problems, as evidenced by her being under the influence on April 19 and her admission that she snorted two lines of methamphetamine; (2) Christopher's failure to protect J. from Tiffany's substance abuse, as he either knew, or reasonably should have known, Tiffany was abusing controlled substances, since they lived together and Christopher admitted she was behaving like she was using drugs, yet he failed to take appropriate action to protect J.; and (3) domestic violence between mother and father based on the April 19 incident. The Department considered Christopher to be J.'s presumed father. While no father was listed on J.'s birth certificate, Christopher held himself out to be J.'s father, had taken J. into his home, and had provided for J.'s care and support.

At the April 22 detention hearing, the juvenile court ordered that J. be removed from his parents' home and detained. The juvenile court appointed attorneys for each parent, and ordered the Department to provide services to the parents, which included parenting, and mental health and domestic violence assessments, as well as a substance abuse evaluation and random drug testing for Tiffany.

In a report prepared for the jurisdictional hearing, the Department reported that J. was still in foster care pending the location of a suitable relative or mentor home. Applications for placement from Lucy and the maternal aunt were being evaluated, and

while Katherine had expressed an interest in placement, her application was not submitted to the home approval unit because Christopher was residing in her home.

The Department's service coordinator met with Tiffany on April 22 to review her individualized service plan letter, which listed the various services the Department offered. Although Tiffany initially declined to participate in parenting, substance abuse and domestic violence evaluations, and random drug testing, she completed the substance abuse evaluation and enrolled for random drug testing on April 27. The evaluator recommended Tiffany participate in a dual-diagnosis intensive outpatient substance abuse treatment program, as well as random drug testing, a domestic violence inventory (DVI), and a mental health assessment. Tiffany was referred to an outpatient treatment program, but she failed to attend the first intake appointment on May 4, or to drug test on that date; her intake appointment was rescheduled to May 27.

The coordinator also met with Christopher on April 22 and provided him with a list of referrals; Christopher indicated his willingness to participate in all of the offered services. He was on the waiting list for the parenting program, and was scheduled to complete a DVI on May 14.

Tiffany was scheduled for a supervised visit with J. on April 27, but the visit was cancelled because Tiffany was under the influence of alcohol and controlled substances. Christopher had supervised visits with J. on April 24 and 27. The visits went well, with Christopher and J. talking, joking and playing with one another.

At the May 13 jurisdictional hearing, the parents executed waivers of rights and agreed to submit based on the social worker's reports and other information in the file. Christopher's attorney informed the juvenile court that Katherine still was interested in placement of J. and Christopher had moved out in the hope J. would be placed there, although he was still receiving his mail at Katherine's home. Tiffany's attorney asked the Department to reassess Tiffany's treatment program; while she was referred to an

7.

outpatient program, she was very interested in a residential one.  The juvenile court found the petition's allegations true and set the dispositional hearing for July 1.

In the report prepared for the July 1 dispositional hearing, the social worker reported that J. remained in foster care.  The Department recommended that J. be adjudged a dependent and remain in out-of-home care, and that the juvenile court order reunification services for Tiffany and Christopher.  Both Lucy's and the maternal aunt's applications for placement were pending approval, and Katherine's application was approved as of June 15.  Given the approval of three relatives, the social worker had scheduled a meeting for July 6 to determine with the family which relative could best meet J.'s needs.

Shortly after J.'s removal, his parents were given an eviction notice due to apparent heavy traffic in and out of their apartment at all hours of the night.  Moreover, several complaints were received of possible unlawful activity taking place at the apartment, as well as additional people living there who were not listed on the parents' lease or Section 8 voucher.  According to the social worker, as a result, Christopher was living at Katherine's home, but he was willing to relocate to a friend's residence should the Department decide to place J. with Katherine.  Although Christopher had filed for a restraining order against Tiffany, he failed to appear at the May 7 hearing.  He withdrew his petition for divorce, as he and Tiffany decided to remain an intact couple as long as it was in J.'s best interest.

Both parents expressed a willingness to engage in services.  Tiffany acknowledged she needed help with her use of controlled substances.  The Department referred Tiffany to a residential substance abuse treatment program and she was participating in treatment. Since Tiffany was now willing to participate in a parenting program and the DVI, the Department was referring her to a parenting program and an appointment for the DVI was pending.  Christopher was on a waiting list for the Department's parenting program and completed his DVI on May 14, but the Department had not received the report.  The

8.

Department resubmitted the request for referral for a mental health assessment for both parents, as the initial referral had not been processed.

The parents had separate twice-weekly supervised visits with J., with Tiffany visiting on Mondays and Thursdays, and Christopher on Mondays and Wednesdays. The parents were consistently attending the visits and their time with J. appeared to be going well. On one occasion, Christopher was seen giving Tiffany and "her buddy" a ride from the visitation center to her treatment program. The social worker informed him of the rules Tiffany had to follow while in residential substance abuse treatment and advised him not to transport her again. The social worker also told Christopher not to show up at the visitation center on Thursdays, when he did not have a scheduled visit, just to see Tiffany.

The Department believed there was a substantial danger to J.'s welfare if he were returned home, and there were no reasonable means to protect J.'s health without removing him from his parents' physical custody. In support, the Department cited Tiffany's substance abuse problem; Christopher's failure to take appropriate action to protect J. from Tiffany's substance abuse even though he recognized she was behaving as if she were using controlled substances, as well as his failure to follow through with any of the legal actions he had initiated; and J.'s exposure to domestic violence. The Department was concerned that these things would place J. at substantial risk of serious physical harm or neglect if he were returned to his parents.

Christopher requested a contested hearing on the issue of whether he could receive family maintenance services while living with Katherine. Accordingly, the dispositional hearing was continued from July 1, and ultimately held on August 21. At the August 21 hearing, the Department submitted on its report. Christopher testified that he was requesting that J. be placed in his care under a plan of family maintenance. About two weeks before the hearing, J. was placed with Katherine. Christopher's plan, should J. be placed in his care, was for the two of them to reside at Katherine's home under her

supervision, with J. going to the day care he was currently attending. Katherine was agreeable to that plan.

Christopher began the parenting class on August 5, and had completed three out of 14 classes. He completed the DVI on May 14, but had not heard about the results. He was told the referral for the mental health evaluation had been submitted, but he had not heard anything further. Christopher was willing to obey all court orders if J. were placed with him, including the court's visitation orders, and said he would be strong enough to prevent Tiffany from having unauthorized contact with J., which was "why we have that specific child care plan in effect[,]" which was for J. to attend daycare across the street from Katherine's work, so she could take him and pick him up.

This was the fourth year Christopher and Tiffany had been married; their anniversary was on January 22. Christopher had considered filing for divorce because the sheriff's office told him he had to do that to get custody of J. "before this whole matter." He was interested in getting custody of J. at that time because he was worried about him and the things Tiffany had done with her girlfriend, including being under the influence.

Christopher did not intend to move forward with the divorce. He thought it would benefit J. for he and Tiffany to be together, as Tiffany was receiving treatment. If Tiffany was not able to establish or maintain her sobriety, they had "multiple different action plans[,]" including: (1) have Lucy and Katherine file for guardianship so J. would have a safe place to stay; (2) have Tiffany remove herself from the situation until she could maintain her sobriety; and (3) keep J. in daycare so he would be out of that unsafe environment. Although at one time Christopher had a restraining order against Tiffany, he did not think he needed one now because Tiffany was "under care," they were trying to be an intact couple and "make it work" for their son, and they were putting their son first. Christopher recalled the VFM case. While "they" talked about offering him services, Christopher claimed he "did not really need any" at that time.

10.

In December 2013, Tiffany had been arrested for attacking Christopher. When she attacked him, he "detained her in the room" and sent her friend, with whom she was arguing, home. Christopher claimed he only got a couple of scratches because "he got in the middle of it." Other than that incident, there had not been "any real serious physical altercations" between them. That incident was the worst things had gotten. Christopher gave Tiffany a ride to her treatment program because he felt badly since he had made her miss a "concurrent planning class." He waited outside the visitation center for her because he wanted to give her the information so she could be prepared for the upcoming court hearing. He claimed this was the only time he waited outside the visitation center for Tiffany; he did not do it again after the social worker told him not to do so. He was not aware that this was not permissible, although he had his suspicions.

Social worker supervisor Donecia Wright testified that another social worker provided Christopher with a parenting packet and advised him to participate in a parenting class, as well as to find alternative methods of discipline. To her knowledge, Christopher had not done these things.

County counsel argued it was not safe to place J. with Christopher due to incidents of domestic violence in April 2015 and December 2013, the foot traffic in the parents' apartment, and father having waited outside the visitation center. J.'s counsel agreed with the Department's recommendation for family reunification, especially since there had not been any progress in domestic violence services. Christopher's attorney argued there was no danger of domestic violence between the parents because the parents were not living together. While Christopher acknowledged the April incident was serious, he believed he had come up with a plan that would allow J. to safely return to him while he completed his services. Christopher's attorney asserted that having the parents live apart, and J. placed in Christopher's care in Katherine's home, were reasonable means to protect J.'s physical health without removing him from Christopher's physical custody.

11.

The juvenile court found the Department made reasonable efforts to prevent removal and that J. was a person described under section 300, subdivision (b), and made him a dependent. The juvenile court further found, by clear and convincing evidence, that J. could not be safely left in his parents' physical custody. The juvenile court agreed with the arguments of County counsel and J.'s attorney, explaining that Christopher had yet to address the issue of domestic violence – the evidence was clear that there had been two incidents of domestic violence, but there was no evidence that either parent had addressed those issues. Accordingly, the juvenile court removed J. from his parents' custody and placed him with Katherine.

The juvenile court ordered supervised visits between J. and Christopher, and unsupervised reasonable visits between J. and Tiffany while she was in the inpatient program. When Tiffany was released to a sober living program, she would receive reasonable supervised visitation. The juvenile court gave the Department discretion to move to unsupervised, up to extended, visits with both parents. The juvenile court ordered reunification services for both parents, consisting of parenting, and domestic violence and mental health evaluations, and any recommended treatment, for both parents. Tiffany was ordered to complete substance abuse evaluation, and recommended treatment, and participate in random drug testing.

## DISCUSSION

*The Removal Order*

Christopher contends the juvenile court erred in ordering J. removed from his custody because he demonstrated he was committed to providing J. a safe home and there was an alternative to removal. Specifically, he argues that this is not an extreme case of abuse or neglect that justifies removal as the only reasonable means to protect J., and because he was cooperative with the Department and willing to participate in services, the record does not establish a substantial danger to J.'s physical health and emotional well-being should he be permitted to be placed with Christopher and Katherine.

12.

"At the dispositional hearing, . . . there is a statutory presumption that the child will be returned to parental custody." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) In order to remove a child from parental custody, the juvenile court must find by clear and convincing evidence that removal is the only way to protect the physical or emotional well-being of the child. (§ 361, subd. (c)(1).) The juvenile court must also determine if reasonable efforts were made to prevent or eliminate the need for the child's removal. (§ 361, subd. (d).)

Section 361, subdivision (c), the governing statute, provides in relevant part: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . :[¶] (1) [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

In determining whether to order a child removed from parental custody, the juvenile court only has to have some reason to believe that circumstances which place the child at a substantial risk of harm would continue in the future. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) Thus, the purpose of the removal statute is to avert harm to the child. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.)

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. [Citation.] When the [juvenile]

13.

court makes findings by the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal. [Citation.] The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 915–916.) In our view, Christopher failed to meet his burden.

Substantial evidence supports the juvenile court's finding that there would be a substantial danger to J.'s physical health, safety, protection, or physical or emotional well-being if he were returned to Christopher's custody, as Christopher had yet to address the reasons that led to J.'s dependency, namely his inability to protect J. from Tiffany's substance abuse and his involvement in domestic violence. This was not the first time these issues had come to the Department's attention. In the VFM case, Christopher did not take advantage of services that were offered to him, asserting that he was "perfect" and was "doing nothing wrong[,]" thereby demonstrating that he was less than willing to protect J. and did not recognize his part in the problems that led to the VFM case.

Christopher also demonstrated a propensity for violence and, in the most recent incident, showed a lack of regard for J.'s well-being by trying to take him from Tiffany in the midst of an argument while holding a cigarette. In the process, he injured J. While the injury was not severe, it could have been worse if, for example, the cigarette hit J. in the eye.[3] This incident shows that Christopher loses control and perspective with respect to J., all of which creates a risk of harm. Without treatment, it is not safe for J. to remain with him, even under Katherine's supervision.

---

[3] Citing *In re James T.* (1987) 190 Cal.App.3d 58, Christopher argues that this was not such an extreme case of abuse or neglect that removing J. from his custody was the only reasonable means to protect him. This case, however, is distinguishable, as there, the appellate court held alternatives to removal should have been considered where the mother's poverty presented her from providing the basic necessities for her 16-year-old son. (*Id.* at pp. 62, 65.) The case did not involve a domestic violence incident which harmed a three-year-old child.

14.

Christopher asserts that his cooperation with the Department, as evidenced by his willingness to receive services and to separate himself from Tiffany, shows that there is no risk of harm. While at the time of the dispositional hearing Christopher had done everything that was asked of him, he had just begun the parenting program and had yet to address the issue of domestic violence. And although Christopher claims that he separated from Tiffany, their separation was caused by the loss of their apartment and Tiffany's entry into residential substance abuse treatment. As Christopher testified, he and Tiffany were an intact couple who wanted to remain a family. Given their continued relationship, the juvenile court reasonably could find that Christopher needed to address his part in the issues that led to dependency before J. could be returned to him.

We further conclude substantial evidence supports a finding that there was no reasonable alternative to removal. Family maintenance services were not an option because Christopher and Tiffany had already received such services, yet failed to prevent the problems that led to this dependency. Until Christopher establishes that he can benefit from the provision of additional services, there is ample evidence that J.'s safety and well-being in the home would be in serious jeopardy were he returned to Christopher's custody.

We conclude substantial evidence supports the juvenile court's order removing J. from Christopher's custody.

*Presumed Father Status*

In dependency proceedings, a man may be a de facto father, an alleged father, a natural father, or a presumed father. (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 (*Jerry P.*).) Of all these categories, only a presumed father is entitled to reunification services and custody of his child. (*Ibid.*)

Here, the Department considered Christopher to be J.'s presumed father – it alleged he was a presumed father in the petition and explained in its reports that while no father was listed on J.'s birth certificate, Christopher held himself out to be J.'s father,

15.

had taken J. into his home, and had provided for J.'s care and support. (See *Jerry P.*, *supra*, 95 Cal.App.4th at p. 802 [a man can establish presumed father status by receiving the child into his home and openly holding the child out as his natural child]; Fam. Code, § 7611, subd. (d).) The juvenile court treated Christopher as J.'s presumed father by ordering reunification services for him. Nevertheless, Christopher contends the juvenile court erred because none of the court's minute orders recognize him as J.'s presumed father. He asks us to correct the juvenile court's error and confirm he is J.'s presumed father.

There is nothing in the record to show that Christopher raised this issue before the juvenile court, or that he asked the juvenile court to make an express finding that he is J.'s presumed father. "As a general rule, a party is precluded from urging on appeal any point not raised in the trial court." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 411–412 (*Riva M.*); *In re Elijah V.* (2005) 127 Cal.App.4th 576, 582 ["A parent's failure to raise an issue in the juvenile court prevents him or her from presenting the issue to the appellate court."].) "[N]onjurisdictional issues must be the subject of objection or appropriate motions in the juvenile court; otherwise those arguments have been waived and may not be raised for the first time on appeal." (*In re Christopher B.* (1996) 43 Cal.App.4th 551, 558.) "Any other rule would ' " 'permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.' " ' " (*Riva M.,* at p. 412.)

"[A]pplication of the forfeiture rule is not automatic. [Citations.] But the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. [Citations.] Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters." (*In re S.B.* (2004)

16.

32 Cal.4th 1287, 1293, superseded in part by statute on other grounds as discussed in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.)

Here, by failing to request that the juvenile court expressly find him to be the presumed father, Christopher has forfeited his appellate arguments regarding the court's purported failure to do so. Christopher, however, argues we should not apply forfeiture here because "it is not necessary for a father to have specifically requested presumed father status where his actions and the requests he did make, if granted, would necessarily have resulted in him being found a presumed father[,]" citing *In re Baby Boy V.* (2006) 140 Cal.App.4th 1108, 1116 (*Baby Boy V.*). He asserts the record shows he sufficiently raised the issue since he asked for placement of J. and for family maintenance services, and the Department recognized him as J.'s presumed father.

Christopher's reliance on *Baby Boy V.* is misplaced. There, eight months after a baby born to a drug addicted mother and an " 'identity unknown' " father became a dependent and was placed into foster care, the "alleged" father learned of the baby's existence, went to see a social worker, appeared in court, asked for a paternity test, and stated his desire to support and care for the child. (*Baby Boy V.*, *supra*, 140 Cal.App.4th 1108, 1110.) The juvenile court denied the request for a paternity test and terminated parental rights as to the " 'identity unknown' " father as well as the man who appeared in court. (*Ibid.*)

In reversing the father's denial of the request for a paternity test and the termination of parental rights, the Court of Appeal rejected the social service agency's contention that he waived his right to request presumed father status because he did not expressly request it below. (*Baby Boy V.*, *supra*, 140 Cal.App.4th at p. 1116.) The appellate court explained that the father had done everything he could do, including: (1) going to the agency's office as soon as he learned of the child's birth and being told to appear at the next scheduled court hearing rather than the agency arranging for an immediate court appearance; (2) requesting a paternity test at that hearing, only to be told

by the court that confirmation of his status would be irrelevant because reunification services would not be granted and his parental rights would be terminated in any event; and (3) appearing at the next hearing and telling the court that he wanted to provide for and have a relationship with the child, but having his parental rights nevertheless terminated. (*Ibid.*) While the appellate court recognized that father did not expressly request presumed father status, it determined that a formal request would have been futile, and therefore his omission could not be treated as a waiver of his right to challenge the order denying his request for reunification services. (*Ibid.*)

Here, there is nothing to suggest that it would have been futile for Christopher to ask the juvenile court to make an express finding of presumed father status on the record. The Department considered him to be the presumed father and the juvenile court, rather than denying Christopher the rights of a presumed father, granted those rights to him. Accordingly, we conclude that Christopher has forfeited his appellate argument regarding his presumed father status.

## DISPOSITION

We affirm the juvenile court's dispositional order removing J. from Christopher's custody.

_____
GOMES, J.

WE CONCUR:

_____
LEVY, Acting P.J.

_____
DETJEN, J.

18.